# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

TAMI L. RICHARDSON,

        Plaintiff,

vs.

NANCY K. BERRYHILL,
Acting Commissioner of Social Security,

        Defendant.

No. 16-CV-141-LRR

**REPORT AND RECOMMENDATION**

_____

    The claimant, Tami Lynn Richardson (claimant), seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for disability insurance benefits, under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. (Act).  Claimant contends that the Administrative Law Judge (ALJ) erred in determining that she was not disabled.

    For the reasons that follow, I recommend the District Court affirm the Commissioner's decision.

## I.    *BACKGROUND*

    I adopt the facts as set forth in the parties' Joint Statement of Facts.  (Doc. 12). Claimant was born on June 14, 1975.  (AR 31).[1]  Claimant has past work as an administrative assistant, assembly worker, income maintenance worker, machine

---

[1] "AR" refers to the administrative record below.

operator, and stock room attendant. (AR 17, 205). Claimant was 36 years old at the time of her alleged disability onset date, which is defined under 20 C.F.R. § 404.1563 as a younger individual (AR 21). Claimant has a high school education and is able to communicate in English. (*Id.*).

On May 9, 2013, claimant protectively filed an application for disability benefits alleging a disability onset date of June 1, 2012. (AR 158). She claimed she was disabled due to major depressive disorder; anxiety disorder not otherwise specified; borderline personality disorder; gastroesophageal reflux disease; history of foot fracture; and reported irritable bowel syndrome. (AR 14-15, 205).

The Social Security Administration denied claimant's disability application initially (AR 93-96) as well as on reconsideration (103-06). Claimant filed a request for a hearing before an Administrative Law Judge (ALJ). On November 6, 2014, ALJ Eric S. Basse conducted a video hearing at which claimant and a vocational expert testified. (AR 29-65). Claimant's attorney submitted additional medical evidence post-hearing, which the ALJ considered. (AR 63, 503-08—additional evidence on the topics of irritable bowel syndrome and diarrhea episodes). On March 24, 2015, the ALJ found claimant was not disabled. (AR 22). On May 4, 2016, the Appeals Council affirmed the ALJ's finding. (AR 1). The ALJ's decision, thus, became the final decision of the Commissioner. 20 C.F.R. § 404.981.

On July 6, 2016, claimant filed a complaint in this court. (Doc. 3)[2]. The parties have briefed the issues, and this case was deemed fully submitted. (Doc. 18). On April

---

[2] In the complaint, claimant alleges that the ALJ "improperly substituted his opinion for the opinion of the treating source." (Doc. 3, at 2). Such argument is wholly absent from her brief, thus it was not considered. *See generally* LR 7; *see also* LR 7(d) ("For every motion, the moving party must prepare a brief containing a statement of the grounds for the motion and citations to

3, 2017, the Honorable Linda R. Reade, United States District Court Judge, referred this case to me for a Report and Recommendation.

## II.    DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual has a disability when, due to her physical or mental impairments, she "is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). If the claimant is able to do work which exists in the national economy but is unemployed because of inability to get work, lack of opportunities in the local area, economic conditions, employer hiring practices, or other factors, the ALJ will still find the claimant not disabled.

To determine whether a claimant has a disability within the meaning of the Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Kirby v. Astrue*, 500 F.3d 705, 707-08 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in

---

the authorities upon which the moving party relies."). Also in the complaint, claimant alleges that the ALJ's decision "is not supported by substantial medical evidence." (*Id.*). This argument was addressed in so far as claimant made specific arguments in her brief regarding medical evidence.

substantial gainful activity, then the claimant is not disabled. "Substantial" work activity involves physical or mental activities. "Gainful" activity is work done for pay or profit, even if the claimant did not ultimately receive pay or profit.

Second, if the claimant is not engaged in substantial gainful activity, then the Commissioner looks to the severity of the claimant's physical and mental impairments. If the impairments are not severe, then the claimant is not disabled. An impairment is not severe if it does not significantly limit a claimant's physical or mental ability to perform basic work activities. *Kirby*, 500 F.3d at 707.

The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. These include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); 20 C.F.R. § 404.1521(b).

Third, if the claimant has a severe impairment, then the Commissioner will determine the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled regardless of age, education, and work experience. *Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity (RFC) and the demands of her past relevant work. If the claimant can still do her past relevant work then she is considered not disabled.

Past relevant work is any work the claimant performed within the past fifteen years of her application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite [ ] her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (citations and internal quotation marks omitted). The RFC is based on all relevant medical and other evidence. The claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Id.* If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled.

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. The Commissioner must show not only that the claimant's RFC will allow her to make the adjustment to other work, but also that other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). If the claimant can make the adjustment, then the Commissioner will find the claimant not disabled. At Step Five, the Commissioner has the responsibility of developing the claimant's complete medical history before making a determination about the existence of a disability. The burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### III.   THE ALJ'S FINDINGS

The ALJ made the following findings at each step.

At Step One, the ALJ found that claimant has not engaged in substantial gainful activity since June 1, 2012, the alleged onset date.  (AR 14).

At Step Two, the ALJ found that claimant has the severe impairments of major depressive disorder, anxiety disorder not otherwise specified, and borderline personality disorder.  (AR 14).  The ALJ found claimant has the non-severe impairments of gastroesophageal reflux disease, history of foot fracture, and reported irritable bowel syndrome (IBS).  (AR 15).

At Step Three, the ALJ found that none of the claimant's impairments equaled a presumptively disabling impairment listed in the relevant regulations.  (AR 15-16).  The ALJ explicitly mentioned and discussed Listings 12.04, 12.06, and 12.08.  (AR 15).

At Step Four, the ALJ found claimant had the following RFC:

> [Can] perform a full range of work at all exertional levels but with the following nonexertional limitations:  the claimant can perform simple, routine, and repetitive tasks with occasional workplace changes.  She can have no public interaction, and occasional interaction with supervisors and coworkers, but generally solitary tasks.  The claimant can perform no tandem work with other coworkers and cannot work at a production rate pace.

(AR 16).  Also, the ALJ determined that claimant cannot perform her past work.  (AR 21.)

Finally, at Step Five, the ALJ found that an individual with claimant's age, education, and RFC could perform the following jobs—marker, mail clerk, and insert mach[ine] oper[ator]—that exist in significant numbers in the national economy.  (AR 21).

## IV.    THE SUBSTANTIAL EVIDENCE STANDARD

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ..").  "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645.  The Eighth Circuit Court of Appeals explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citations and internal quotation marks omitted).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but we do not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989).  The court, however, does not

"reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)).  Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)).  This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)).  The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) (citation omitted) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## VI.  DISCUSSION

I turn to now address claimant's specific objections about the ALJ's decision. Claimant asserts the ALJ erred in three ways, as follows:

(1) claimant satisfies Listing 12.04;

(2) flawed hypothetical posed to vocational expert resulted in incorrect RFC assessment; and

(3) improperly discredited claimant's subjective complaints.

I address these arguments in turn below.

## A.   *Listing 12.04*

Claimant alleges that her impairments are medically equivalent to Listing 12.04, which governs affective disorders. Specifically, she claims that she satisfies both the paragraph B criteria and the paragraph C criteria. On the other hand, the Commissioner alleges that claimant neither meets paragraph B nor C criteria. The Commissioner concedes that "[t]he ALJ's explanations [on Listing 12.04] were admittedly somewhat conclusory" but explains that the ALJ explicitly referenced his lengthier discussion in his RFC assessment. (Doc. 16, at 8) (citing AR 15-20). Further, the Commissioner explains that the ALJ relied on state agency experts' opinions.

In order to satisfy Listing 12.04, a claimant's mental disorder must meet the requirements of paragraph A and the requirements of paragraph B (or in the alternative the requirements of paragraph C). 20 C.F.R. Pt. 404, Subpt. P, App. 1 A2 Section 12.00(A) (2015).[3]

In the decision, the ALJ summarizes the criteria of Paragraphs B and C as follows:

> [Paragraph B criteria,] the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

---

[3] In the parties' respective briefs, claimant's footnote 2 and Commissioner's footnote 2 agree that despite substantive changes made to Listing 12.04 effective January 17, 2017, only the listing as it existed at the time of the final decision governs. The ALJ dated his denial decision in March 2015. For my review of the ALJ's decision, I applied the rules that were in effect at the time of the decision.

[Paragraph C criteria,] medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs attenuated by medication or psychosocial support, and any one of the following: 1. Repeated episodes of decompensation, each of extended duration; or 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement.

AR 15-16 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1 Section 12.04(B-C)).

At issue here is only paragraph B criteria and paragraph C criteria. Neither party nor the ALJ mentions paragraph A criteria, as it was clearly established by the medical records. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 Section 12.04(A) ("Depressive syndrome characterized by . . ..").

The ALJ found that claimant satisfied neither paragraph B or C criteria. For paragraph B criteria, the ALJ found that claimant had moderate difficulties in social functioning, moderate difficulties in concentration/pace/persistence, and no episodes of decompensation during the relevant time period. (AR 15). Finally, for paragraph C criteria, the ALJ found that claimant did not have a chronic affective disorder of at least two years and did not have any of the symptoms listed above. (AR 16).

Claimant has the burden of proving that her impairments satisfy Listing 12.04. *See Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004) ("To meet a listing, an impairment must meet all of the listing's specified criteria.")). Also, a claimant must "present medical findings equal in severity to *all* of the criteria for the one most similar listed impairment." (*Id.*) (emphasis in original) (quotation omitted). The listings identify

medical impairments so severe that "it is likely that [those claimants] would be found disabled regardless of their vocational background." *Bowen*, 482 U.S. at 153 (the purpose of the listings is to streamline the process of determining disability).

### i.    *Paragraph B criteria*

First claimant argues that she satisfies paragraph B criteria as she has both: (1) marked difficulties in social functioning; and (2) repeated episodes of decompensation. Claimant must prove both. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 Section 12.04(B).

Claimant contends that her impairments resulted in marked difficulties in her maintaining social functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1 Section 12.04(C)(2) ("[Social functioning activities include] capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals . . . includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers."). A marked limitation is defined as "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." *Id.* at Section 12.00 (F)(2)(d). A mild limitation is when a claimant's functioning is slightly limited, a moderate limitation is when a claimant's functioning is fair, and an extreme limitation is when the claimant cannot function in this area. *Id.*, at Section 12.00 (F)(2)(a)-(e).

Claimant argues that the "medical records also show that she had 'marked difficulties in maintaining social functioning' during this time. She had difficulties even attending the partial hospitalization sessions because of her anxiety." (Doc. 13, at 6). Further, she maintains that despite being familiar with the hospital her anxiety and

depression are so unmanageable that "she was not even able to attend the very program designed to help her with her illness." (*Id.*, at 7). The Commissioner on the other hand contends that claimant "[u]ndoubtedly, [ ] had social limitations," yet overall she "functioned adequately socially." (Doc. 16, at 12).

I find that there is substantial evidence on the record as a whole to support the ALJ's finding that claimant suffers only moderate social functioning difficulties. (AR 15). In its entirety, the record reveals evidence of claimant engaging in the following activities: maintaining a stable, supportive relationship with her boyfriend (AR 33-34, AR 221—boyfriend wrote that he and claimant live together and "act as a family to all of our children," AR 361); maintaining a good relationship with her parents (AR 319, claimant's parents are "supportive [and] primary means of social support" and AR 40, mother attended some college classes with her for support, AR 217 mother comes over for company); going bowling on a team with her boyfriend every week (AR 217, although she alleges that her boyfriend makes her attend to get her out of the house AR 225); taking care of her son (AR 222, claimant will bathe son, read to him, and take care of his basic needs); positively contributing to group therapy sessions (AR 416, dated June 3, 2014 "[claimant] participated appropriately in group discussion"). Both non-examining state consultants opined that claimant only had moderate social interaction limitations. Jennifer Wigton, Ph.D., opined on July 7, 2013, that claimant was moderately limited in her appropriate interaction with the general public, not significantly limited in asking questions or requesting assistance, moderately limited in her ability to accept criticism and instructions from supervisors, moderately limited in her ability to get along with co-workers. (AR 73). Myrna Tashner, Ed.D., reached the same findings

on reconsideration on August 28, 2013.[4]  (AR 85-86).  The record did reveal that claimant expressed anxiety about being in public (AR 44), being employed and working with co-workers (AR 45-46, 48), and had a poor relationship with her sister. (AR 319). Nonetheless, the record supports the ALJ's finding that claimant's social functioning was fair.  Thus, the Court finds substantial evidence exists in the record as a whole to support the ALJ's conclusion that claimant only had moderate difficulties with social functioning.

Again claimant must prove two limitations under paragraph B (marked limitations in social functioning and episodes of decompensation).  As claimant fails to satisfy the marked limitations in social functioning, she already cannot meet the criteria of paragraph B.  Nonetheless, for the benefit of the district judge, I will also analyze claimant's episodes of decompensation claim.

Claimant alleges that she has the requisite "repeated episodes of decompensation, each of extended duration" by having been hospitalized repeatedly.  Episodes of decompensation are defined as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  20 C.F.R. Pt. 404, Subpt. P, App. 1 Section

---

[4] I note that the date of review by these non-examining state consultants is July and August 2013. Thus, they did not review the additional medical records on the record after that time.  However, I find that the ALJ's reliance on these consultants was proper.  *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("[B]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it.").

12.00(C)(4).  They may be demonstrated by "an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)."  (*Id.*).  They can be inferred from documentation displaying the need for a "more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household) or medical records documenting significant medication alteration, or other relevant information."  (*Id.*).

Repeated episodes of decompensation, each of extended duration, means "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."  *Id.*, at Section 12.04(C)(4) ("If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.").

Claimant essentially alleges her three hospitalizations equate to repeated episodes of decompensation.  As the Commissioner astutely points out, the Court will not rely on medical evidence predating the alleged disability onset date.  *See Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008).  Given the disability onset date of June 1, 2012, claimant only alleges two relevant hospitalizations, namely: (a) a partial-hospitalization program in St. Luke's from July 2012 to September 2012, remaining October, November, and still in January (AR 344, 347, 384); and (b) another partial-hospitalization program in March 2014 where she was discharged in June 2014 due to insurance coverage loss (AR 413-17, 430-37, 484, 486).  The Commissioner characterizes claimant's argument as trying to show that her "two episodes of decompensation over a multi-year period (in 2012 and 2014, respectively" equaled to "three extended episodes of decompensation in a one-year period."  (Doc. 16, at 10).

The Commissioner further contends that these hospitalizations were mere "group therapy and counseling sessions three days per week" and were not the sort of highly-structured environments contemplated by the listing. (*Id.*, at 11). Lastly, the Commissioner contends that both of the state agency consultants (Jennifer Wigton, Ph.D. on initial consideration and Myrna Tashner, Ed.D. on reconsideration) found claimant did not meet the requirement of having repeated episodes of decompensation despite reviewing claimant's participation in partial-hospitalization programs.

On review, both non-examining state consultants found that claimant had no repeated episodes of decompensation. (AR 83). These opinions were dated in the summer of 2013, thus both consultants reviewed the medical records and documents accompanying claimant's alleged 2012 repeated episode of decompensation and found it did not qualify. An ALJ may rely on non-examining state consultants. *Smith v. Colvin*, 756 F.3d 621, 626-27 (8th Cir. 2014). This leaves claimant's alleged 2014 episode as the only remaining relevant alleged episode, which the ALJ considered. That one episode must be compared to other evidence in the record that is inconsistent with a pattern of decomposition. For example, on April 28, 2014, the record showed claimant was ("Smiling more, more spontaneous." (AR 443). On May 14, 2014, claimant "said she is starting to feel better with the medication, says 'the blah' is gone . . . Pt said she did get the treadmill cleaned off. Praised patient for making a little progress. . . Pt said she feels the 'fog' is gone." (AR 432). On May 23, 2014, the record shows claimant was "pleasant and cooperative, participates well in programs, adds to discussions appropriately! Interacts well with others!" (AR 424). Furthermore, I find persuasive Commissioner's argument that claimant's episodes (consisting of group therapy and counseling sessions three times a week) are not of the severity contemplated by the listing.

(*See* Doc. 16, at 11) ("During these periods, plaintiff otherwise lived at home and maintained relatively robust daily activities . . . [i]ndeed, on one occasion, while plaintiff complained of stress, she remained able to spend "many hours cooking and preparing food for the group of friends/relatives who came to help install a retaining wall. [AR 345].").

In sum, I find there is substantial evidence on the record as a whole to support the ALJ's decision that claimant did not satisfy the requirement of extended-periods of repeated episodes of decompensation during the relevant time period. *See Baker*, 730 F.2d at 1150 ("The court may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite decision.") (quotation omitted).

Since I found the ALJ's decision is supported by the record that claimant's partial-hospitalizations do not equate to three repeated episodes of decompensation or their equivalents, there is no need to address claimant's lack of means argument that had she not lost her insurance she would have continued with these types of partial-hospitalization programs. (Doc. 13, at 5).

ii. *Paragraph C criteria*

Here claimant raises a similar argument to the one above. She contends her impairments are medically equivalent to paragraph C criteria as she has a current history of one-year or more inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement. I find there is ample evidence (nor is there any contrary allegations before the Court) that claimant meets the first part of paragraph C criteria, namely that she has medically documented history of

chronic affective disorder of at least two-years' duration.[5] Claimant has a lengthy history of depression, spanning back to her high school days (when she attempted suicide for the first time, AR 40). Turning to the requisite "current history of one-year or more current inability to function outside a highly supportive living arrangement," claimant alleges that a *highly supportive living arrangement* may include her residence that she shares with her live-in-boyfriend, and every other week with their separate children (in total three children). *Contra* AR 16 ("[ALJ found that claimant is not] confined to living in a highly supportive environment such as a residential treatment facility."). Claimant also alleges that for "much of a 4 year period" she has been in a partial hospitalization program which only halted due to her loss of insurance. (Doc. 13, at 6).

In support of her argument that a residence may qualify as a highly supportive living arrangement, she cites *Wilson v. Astrue*, 2011 WL 916357, 10-418 (MJD/AJB) (D. Minn. Feb. 11, 2011), *report and recommendation adopted*, No. CIV. 10-418 MJD/AJB, 2011 WL 938304 (D. Minn. Mar. 16, 2011). In particular, claimant cites footnote 21 which reads:

> "[A] highly supportive living arrangement" is discussed, in relevant part, as follows: Particularly in cases involving chronic mental disorders, overt symptomatology may be controlled or attenuated by psychosocial factors such as placement in a hospital, halfway house, board and care facility, or other environment that provides similar structure. Highly structured and supportive settings may also be found in your home. Such settings may

---

[5] The medical records show that claimant has a documented history of chronic affective disorders spanning over a two-year period. *See* AR 320 (medical note dated April 20, 2010 [predating alleged disability onset date] signed by treating medical doctor, Bryan Netolicky, describing claimant as having "Major depressive disorder, recurrent, moderate-to-severe without psychosis."); (AR 349-50) (Dr. Netolicky signing that claimant is diagnosed with "a recurrent major depressive disorder [and] anxiety features including panic attacks" dated January 10, 2013); going into 2014 (AR 504-April 2014 and AR505-October 2014).

greatly reduce the mental demands placed on you. With lowered mental demands, overt symptoms and signs of the underlying mental disorder may be minimized. At the same time, however, your ability to function outside of such a structured or supportive setting may not have changed. If your symptomatology is controlled or attenuated by psychosocial factors, we must consider your ability to function outside of such highly structured settings....

(*Id.*, at *14 n.21) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 12.00F). In *Wilson*, the court found that a group-living or shared housing environment qualified as a highly supportive living arrangement as claimant's "living needs are met by the government and managed by a social worker, and [claimant] receives help from a nurse on a weekly basis." (*Id.*).

Claimant's argument that her living arrangement is similar to the one in *Wilson* is unpersuasive. Although claimant's boyfriend does remind her to wash herself, and has primarily responsibility for their children, pets, household chores, outdoor chores, and cooking, such an arguably assistive living situation does not equate to a home living situation where her living needs are met by multiple parties including nurses and social workers. Claimant's significant other, while he admittedly helps claimant, works a full-time job and thus is gone for most of the day during the workweek. He works for Discovery Living, a residential provider. He oversees three homes. While his normal workhours are from 8 a.m. to 5p.m., he can be called at any time. Thus, claimant's boyfriend does not provide claimant with the type and the level of assistance contemplated by a "highly supportive" living arrangement. If the standard were a lowly or intermediately supportive living arrangement, then the analysis would likely be different. Again, the importance of these listing must be considered. These listing serve the purpose of streamlining the most severe impairments into an automatic affirmative disability

finding. Generally, "highly supportive living arrangements" include care facilities, halfway houses, hospitals, and home settings where the mental demands are greatly reduced. *See Myers v. Colvin*, 721 F.3d 521, 526 (finding no highly supportive living arrangement where claimant lived with boyfriend and there were no "particular arrangements to reduce her mental demands.").

I find there is substantial evidence on the record to support the ALJ's conclusion that claimant did not live in a highly supportive living arrangement. Here claimant even testified that sometimes she helps out her boyfriend by using the computer when he requests. (AR 36 ("[Using the computer] I look at bank account information sometimes. Maybe [for] 20 minutes. Usually it's because [her boyfriend] asked me to look at something for him.")). Again, claimant bathes her son, feeds him, and reads to him. (AR 222). She will also let out the dogs if her boyfriend is not home. (AR 35). Claimant will drive herself if needed. (AR 216). She can pay bills, count change, handle a savings account, and use a checkbook/money orders. (*Id.*). Sometimes she fills her own Med Minder for the week as a reminder to take her medication. (AR 215). Thus, as I find that the record supports the ALJ's finding that claimant's shared home with her boyfriend is not a highly supportive environment, there is no need to analyze claimant's lack of means argument centering on her loss of insurance.

### B.    *Improper hypothetical question resulted in a flawed RFC*

Claimant alleges that the ALJ's RFC assessment is flawed due to the ALJ's failure to "consider claimant's need to be absent from work." (Doc. 13, at 7). Specifically, the ALJ erred in using his first hypothetical question posed to the vocational expert, which did not account for any absenteeism from the workplace. Specifically, claimant contends

the ALJ failed to consider "the extent of [claimant's] anxiety when leaving the house and how it affects her ability to attend work . . . despite substantial evidence supporting [a finding of absenteeism]." (Doc. 13, at 7-8). Meanwhile, the Commissioner contends that the ALJ "specifically considered [claimant's] alleged inability to leave the house at times but rejected it based on substantial evidence" and further that the RFC assessment is supported by substantial evidence on the record. (Doc. 16, at 13).

As the Eighth Circuit Court of Appeals succinctly stated in *Hillier v. Social Security Administration*,

> Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision." *Lacroix v. Barnhart,* 465 F.3d 881, 889 (8th Cir. 2006) (quotation omitted). Hypothetical questions should "set[ ] forth impairments supported by substantial evidence [on] the record and accepted as true," *Goff v. Barnhart,* 421 F.3d 785, 794 (8th Cir. 2005) (quotation omitted), and "capture the 'concrete consequences' of those impairments," *Lacroix,* 465 F.3d at 889 (quoting *Roe v. Chater,* 92 F.3d 672, 676–77 (8th Cir. 1996)).

*Hillier v. Soc. Sec. Admin.*, 486 F.3d 359, 365 (8th Cir. 2007). Also, the ALJ's hypothetical question to the vocational expert "needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) (internal quotation and citation omitted). In other words, the ALJ is "not obligated to include limitations [in the hypothetical question] from opinions he properly disregarded." *Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010) (internal citation omitted). *See also Pearsall v. Massanari,* 274 F.3d 1211, 1220 (8th Cir. 2001) (internal citation omitted) ("The ALJ's hypothetical properly included all impairments that were accepted by the ALJ as true and excluded other alleged impairments that the ALJ had reason to discredit."); *accord Smith*, 756 F.3d at 626 (citing

*Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir. 2004)) (" We also conclude that the ALJ properly phrased the hypothetical to the vocational expert, recognizing that a hypothetical need only include impairments that the ALJ finds credible.").

The first hypothetical question posed to the vocational expert follows:

> [A] hypothetical individual the claimant's age, education, past work, no exertional limitations; capable of simple routine repetitive tasks in job environments that have only occasional workplace changes, basically very routine repetitive; no interaction with the general public; occasional interaction with supervisors; occasional interaction with coworkers but generally working in solitary tasks, not tandem working with another coworker; and no production rate pace.

(AR 59). In response to this hypothetical, the vocational expert answered that an individual described as such and with no past work could, nonetheless, perform the job duties of a marker, unskilled mail clerk, and inserting machine operator. (AR 60). All of these jobs are light and unskilled work that exist in significant numbers in the nation and in the State of Iowa. (*Id.*). Also at the hearing, the vocational expert explained that "typically employers will tolerate" one to two days a month unscheduled no-show days. (AR 61). Only a "small percentage of employers would tolerate 2 days," the vocational expert guessed 18 percent. (*Id.*). The vocational expert believed that no competitive, full-time work existed for a claimant who would miss three unscheduled days of work per month. (*Id.*).

Ultimately, the ALJ did find that claimant's RFC allowed her to perform the job duties of: marker, mail clerk, and insert machine operator. (AR 22). Thus, claimant is correct in alleging that the first hypothetical posed to the vocational expert was the one used to formulate claimant's RFC assessment. Again, the ALJ found claimant's RFC assessment included: the claimant can perform simple, routine, and repetitive tasks with

occasional workplace changes. She can have no public interaction, and occasional interaction with supervisors and coworkers, but generally solitary tasks. The claimant can perform no tandem work with other coworkers and cannot work at a production rate pace. (AR 16).

Claimant cites case law where the ALJ's hypothetical question to the vocational expert was flawed due to a failure to include absenteeism caused by impairments. (Doc. 13, at 7). That is not the case here, though. The ALJ considered and determined that claimant's impairments do not cause absenteeism. (AR 17-18). The ALJ considered claimant's 2012 job loss due to "unexcused absences and overall lack of reliability" as well as claimant's testimony that her "mental health symptoms and bowel problems prevent her from maintaining a regular schedule or leaving the home often," and treating source, Dr. Netolicky, stating that claimant was missing "approximately over 50% of her partial hospital program sessions as a result of her anxiety about leaving the house and interacting with others." and claimant's otherwise "sporadic" partial hospital attendance). (AR 349). Yet, the ALJ noted that "[C]laimant alleges that she has difficulties leaving the house; however, she bowls weekly." (AR 19).

I find that substantial evidence supports the ALJ's decision that absenteeism should not be included in claimant's RFC assessment. *See* AR 74, 217 (claimant bowls every week, once a week on a "two person team"). Additionally, the ALJ finds that many of claimant's subjective complaints and self-reported daily activities are not supported by the evidence (see section below for further discussion). Furthermore, substantial evidence supports the RFC assessment. *See* AR 73, 74, 85, 87 (support for no public interaction); AR 73, 74, 86, 87, 222, 337, 424, 425, 428 (support for occasional interaction with supervisors and coworkers); AR 73, 74, 86, 87 (support for no tandem

work with other coworkers); and AR 72, 74, 85, 87, 337 (support for no production pace). Admittedly, the record (both medical evidence and other evidence) is quite sparse in this case. Nonetheless, there is substantial evidence in the record to support the ALJ's findings. Thus, I find that the ALJ neither erred in his hypothetical nor in his RFC assessment of claimant.

### C.     Failed to properly consider the Polaski factors

Claimant alleges that the ALJ gave undue weight to claimant's weekly bowling sessions with her boyfriend and gave no weight to third party observations on the record. Overall, the ALJ found claimant was "not entirely reliable" thus her "credibility is eroded." (AR 20).

I find the ALJ correctly considered the relevant *Polaski* factors in determining claimant's credibility. Under the *Polaski* factors, an ALJ must consider the "claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) claimant's daily activities; (2) duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions." *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984). In *Lowe*, the Eighth Circuit Court of Appeals stated, "[t]he ALJ was not required to discuss methodically each *Polaski* consideration, so long as he acknowledged and examined those considerations before discounting [claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (internal citation omitted). If the ALJ gives a good reason for discrediting a claimant's credibility, then the court will defer to the ALJ's judgment "even if every

factor is not discussed in depth." *Dunahoo v. Apfel,* 241 F.3d 1033, 1038 (8th Cir. 2001).

"Although the ALJ may disbelieve a claimant's allegations of pain, credibility determinations must be supported by substantial evidence." *Jeffery v. Sec'y of Health & Human Servs.*, 849 F.2d 1129, 1132 (8th Cir. 1988) (internal citation omitted). "Moreover, the ALJ must make express credibility determinations and set forth the inconsistencies in the record that lead him to reject the claimant's complaints." *Id.* "Where objective evidence does not fully support the degree of severity in a claimant's subjective complaints of pain, the ALJ must consider all evidence relevant to those complaints." *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (internal citation omitted). In evaluating a claimant's subjective complaints of pain, an ALJ may rely on a combination of his personal observations and a review of the record to reject such complaints. *Lamp v. Astrue,* 531 F.3d 629, 632 (8th Cir. 2008). However, the ALJ may not solely rely on his personal observations to reject such claims. *Id.* Thus, "[s]ubjective complaints can be discounted [by the ALJ], however, where inconsistencies appear in the record as a whole." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003) (citing *Polaski*).

Overall, I find the ALJ properly considered claimant's subjective complaints under the *Polaski* factors. *See* AR 19-20 (ALJ's analysis under *Polaski* factors included noting inconsistencies between claimant's testimony and the record as well as noting that she did not receive the type of medical care that one would expect for a totally disabled person). *See Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007) ("A claimant's allegations of disabling pain may be discredited by evidence that the claimant has received minimal medical treatment.") (quotation omitted). Furthermore, the ALJ may properly discount

the observations by non-medical, interested third parties, namely Mr. Jeremy Moser and Ms. Iva Sickels. In regard to claimant's live-in boyfriend, an ALJ may discount the consistent observations of a financially interested third-party. (AR 19) ("A third party (the claimant's boyfriend) report is generally consistent."). *See Choate v. Barhart*, 457 F.3d 865, 872 (8th Cir. 2006) ("Corroborating testimony of an individual living with a claimant may be discounted by the ALJ, as that person has a financial interest in the outcome of the case."). In regard to the observations by claimant's friend/neighbor, the ALJ properly found her to be an interested party (a friend of claimant's) thus "by virtue of the relationship as claimant's [ ] friend, the witness [ ] cannot be considered [a] disinterested third part[y] whose testimony would not tend to be colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges." (AR 20). The ALJ properly reviewed and discredited the third party statements by these interested parties. Thus, the record supports the ALJ's credibility determination.

## VI. CONCLUSION

For the reasons set forth herein, I respectfully recommend the District Court **affirm** the Commissioner's determination that claimant was not disabled, and enter judgment against claimant and in favor of the Commissioner.

Parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and FED. R. CIV. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* FED. R. CIV. P. 72. Failure to object

to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED** this 27th day of April, 2017.

_____
C.J. Williams
Chief United States Magistrate Judge
Northern District of Iowa